May I please the court? Your honors, my name is Austin Smith and I along with my co-counsel represent BVS Construction as the appellant and we would like to reserve five minutes for rebuttal which my co-counsel will be handling. I'd like to address two issues today. The first addresses payments that BVS made to Prosperity that have not been credited to the principal balance. Not only does the 2014 plan allow crediting payments post-petition pre-confirmation, it mandates it. And then the second issue relates to our subject matter jurisdiction argument. The main issue and dispute here is whether the plain language of the 2014 plan transfers ownership of the secured debt when BVS merely agreed to pay the debt of both the Palisades individually and BVS. Let me ask you what your interpretation of Judge King's September 2015 order is. The caption of it is for both bankruptcies, BVS and the individual, both case numbers on there. It confirms the amended plan of reorganization. It does seem to me, even though these were not consolidated, you correct me, I don't think they were, that Judge King treated these, this order as resolving both, affecting both and setting the path forward on paying the debt on this payment plan. Why isn't that enough to satisfy what has to be done here to offset your argument? Well, Your Honor, first of all, the plain language of the 2014 plan does not expressly transfer liability to BVS. And as you all recall, in the 2014 plan, it was in fact a joint amended plan. However, in the 2019 plan, this is now BVS's own bankruptcy and there is another bankruptcy currently going on with Mr. Palisade, Sr. individually. Now along those lines, essentially prosperity in their brief misconstrues our point here. The central question is, you know, does the effect of BVS agreeing to make the payments constitute them accepting liability under the 2014 plan for all five notes? First of all, the Palisades individually took out the loans on notes one, three, and four. BVS took out notes two and five. Secondly, in the objection to the proof of claim hearing in 2019, prosperity concedes that the original debt was owned by Ricky Palisade individually. Secondly, prosperity also admitted in that same hearing that the 2014 plan says nothing about shifting liability to BVS. Under the language of the plan itself, the plan notes that, first of all, BVS will take out a lease from the Palisades in order to use the property. That would imply that they are not the actual owners of that debt because they would probably not need to do that if they did take on the debt. Secondly, the plain language of the plan lays out the ownership of each note and the amounts and when they were taken out prior to stating that BVS will agree to pay the debt under all the notes. Thirdly, when the 2019 plan was filed, that by default dismissed the 2014 plan, when that petition was filed in 2019. Now, that essentially should revert the debts back to the original owners under the notes, and that leads us, I guess, to the basis of our assertion that the bankruptcy court was without jurisdiction to accept BVS's full liability under notes one through five. I can go into the payments as well. Under the plain language of the plan, we have the plan affirmatively stating that postpetition pre-confirmation payments shall be credited to the debt after the plan is confirmed. As you all will note in our brief, we laid out four payments from, I believe it was July through October of 2015, in the exact same amounts as the 38 payments that were made after plan confirmation that were not credited to the principal balance of the loan in Prosperities 2019 proof of claim. Just to be clear, we are asserting that the 2019 proof of claim amount is incorrect, and under the plain language of that plan, those four payments should have been credited to the principal balance after plan confirmation. Now, again, Prosperity notes in its brief and in the proof of claim hearing that these were interest payments. However, Ricky Palosota goes on to testify, and the record shows three years of forbearance agreements, and in the amounts of those monthly forbearance payments that BVS was paying included the 18 percent interest that they're alleging. If we're talking about the interest under the plan, we're talking about a 5 percent interest, which, as those 38 payments show, were not strictly going to interest. There was a portion of those payments that were going to interest, but not the full amount. And so the effect of allowing these payments not to be credited to the balance is twofold. One, the principal balance was not reduced, and two, the interest was allowed to accrue on a higher principal balance for the last three years. Now, you know, we're not here to do the total math on that. That can be done in the bankruptcy court when a full accounting has been made. But those payments totaled to $96,000, and the interest would come out to roughly $20,000 to $30,000 over the last three years. So this is, you know, we're not talking about dollars and cents here. I mean, this is a pretty good amount. Now going back to another set of payments that I mentioned at the beginning of this, the 2019 payments. We have seven payments from May to November of 2019. Now, again, at this, at the proof of claim hearing, Prosperity notes that the payments were adequate protection and namely interest payments again. In their brief, they argue that the proof of claim is determined at the time of the 2019 filing, and therefore these payments will be credited to Prosperity's, or to the principal balance of the loan in their system. Well, there are several concerns with this. The first one being these payments are of the same character as the 2014 or the 2015 payments rather that were not credited to the principal balance. Secondly, there's some inconsistencies in the characterization of these payments. There's the position at the hearing gives the impression that these are meant to go directly to interest and or adequate protection. But in the brief, Prosperity implies that they will be credited to the principal balance at some point, but that so far has not happened yet. Now, again, these payments total $133,000. There is an adequate protection order in the record that notes these payments. We would argue, though, that even if these are somewhat construed to be interest payments, again, we're talking about a 5% interest rate or at most an 18% interest rate, and that entire balance of that would not go strictly to interest. So the principal should have been affected in some way by these seven payments. Now, how this all relates or how these two payments relate to the judicial estoppel and res judicata judicial admission claims that the bankruptcy court made are that, first of all, the 2014 plan under the plain language has no effect on the 2015 payments. We can have those payments before plan confirmation and have that $1.8 million amount in the 2015 or 2014 plan at the same time, because the plan specifically accounts for those payments. So that would not be an inconsistent position with the plan. It would not be, you know, for the purpose of misleading the court or anything like that, because the plan specifically contemplates that. And the same goes for the 2019 payments as well. These have absolutely nothing to do with the 2014 plan, because the 2014 plan was no longer in effect at the time that these payments were being made. So now we are, you know, what the focus of this entire case is, is what is the amount of the proof of claim in 2019. And we would. I understand what you're saying with the 2019 payments. The bank files its proof of claim in 2019. It's of a certain amount as of that time. The payments you're talking about in 2019 are after that proof of claim is filed, correct? Yes, sir. And so all this is is either accepting or not accepting by the bankruptcy court the claim that's been filed, which is not ordering you to pay it, it seems to me. It's saying this as of the date of filing was the proper amount. And any credit you get for payments you make thereafter is applied to any kind of final resolution. Isn't that how this works? Well, Your Honors, the 2019 plan, unlike the 2014 plan, does not specifically account for payments like this. And again, what Prosperity is arguing is. The one that doesn't take account? I'm not sure I followed you. Well, if you all will recall, the 2014 plan specifically says that post-petition pre-confirmation payments shall be credited to the principal balance. We don't have that language in 2019. And then secondly. Where would it appear? I mean, a proof of claim was filed. Correct. Yeah. So you're saying somewhere in that should have been an acknowledgment of our prosperity. If anything further is paid on this, it'll be deducted from the total amount owed or something? Okay. Yeah, I see what you're saying. So these payments were prior to the proof of claim. And then we have the hearing on the proof of claim that specifically addresses both of these payments. And in that hearing, Prosperity takes the position that this will not be credited to the principal balance whatsoever. Did that answer your question? Well, I'll have to ask the other side about that. I did not understand that was their position. But if you're saying that it is, they can respond to it. That is what we would argue, Your Honor. Or at the very least, that there are inconsistent positions being taken about these payments. Now, to address Res Judicata specifically, Prosperity claims that the 2019 plan is the same transaction as the 2015 plan. That's the transactional test that this court and all the lower courts use in this jurisdiction for Res Judicata. As I stated before, these are completely separate petitions. They're separate cases. They're separate filings. The 2019 payments have nothing to do with the 2014 plan. And again, the 2015 payments may be credited to the principal balance under the plain language of the 2014 plan, and therefore would not be an inconsistent position with the plan. Same goes for judicial estoppel. This is not clearly inconsistent with our position or BVS's position in the 2014 plan. Now, you know, again, for judicial admission, we also have the same considerations. Overall, it seems like our arguments have been misconstrued by the opposing party in that we can have the $1.8 million plan and have our arguments at the same time. It is not currently before this court, and this is not what we are asserting, that the 2014 plan was erroneous or incorrect in any way. That's not for us to decide here. But what is here for us to decide is, is the proof of claim in 2019 correct? And we would argue that based on events that occurred both before and after the 2015 plan confirmation, it's not correct. And, you know, just to be clear, I mean, even if one of these payments should have been credited and was not, this still has to be remanded for an accounting. And, in fact, in the 2019 proof of claim hearing, the trial attorney for Mr. Palazotto and BVS specifically asked for leave to submit to the court a spreadsheet of a full accounting of all the payments that have been made. And the court dismissed that without question. That is what we would ask be done in this case, because a full accounting clearly needs to be done. There's a dispute over payments that are clearly on the record. Mr. Palazotto refers to additional payments that are not part of this record, and so an accounting needs to be had here. Payments made in the 2015 plan, the same, or 14, whatever you're calling it, the same amount per payment as under the 2019 plan? Yes, Your Honor. And there was no explanation as to this goes to interest, or this goes to principal, of just the same flat amount? Correct. Now, after the fact, Prosperity alleges that these are interest payments in their entirety. I understand that, but there was no difference in the amount? Correct, yeah. Okay, thanks. And just one last quick point about the subject matter jurisdiction. The actual language of the plan that Prosperity cites in its brief is, and I quote, commencing on the effective date, the debtor BVS shall make 59 equal payments on the 19,224, et cetera, amount, and one payment on the 60th month of all outstanding principal and interest. I see I'm out of time, Your Honors. May I finish this last point? Thank you. Outstanding principal and interest, the payments shall be due on the 15th day of each month. And again, above this entire portion, it lays out the individual ownerships, Your Honor, and for that reason, we would respectfully ask that this case be remanded and reversed for an accounting of these payments. Thank you. May it please the Court. Sir. Good afternoon. I'm Russell Mills for Prosperity Bank. Let me begin by making a couple of short points up front. One, this appeal here today is a direct collateral attack on a bankruptcy court order that went final more than five years ago. That's what it is. They're trying to relitigate the number to the 2015 plan. We'll talk about that in a minute.  The appellant says that prosperity is getting some sort of windfall. That's not true at all. And I'll show the court that in a second. We're going to go through the numbers. So what happened at the hearing below is that the debtor's principal testified that BVS had made payments beginning in 2012 all the way to 2019. Now, remember, the first bankruptcy was filed in November of 14. So he's saying that he made payments before that and after that. So he produced written evidence of payments that he made beginning only in early 14, some $170,000 before the petition date in November. Okay? So then here's the rub. The bank's evidence was two ledgers, okay? And those ledgers start out with $1,812,000 and some dollars because that's the number that was in the 2015 plan. That was the agreed number. So it took $1,800,000 and it reduced all of those, that number by all the payments, by the payments, the 2014 adequate protection payments, by the plan payments for the next two, 39 months, and then you have a stopping point as Judge Southwick pointed out earlier, stopping point of the petition date in 2019, in January. And these ledgers, I'll show you this in a minute, the ledgers go on to show that the 2019 adequate protection payments were given credit for. Okay? So that's the issue here today. The issue is, does the debtor, since we have a full accounting of all the payments after the $1,800,000, the question is, does the debtor get to renege on the $1,800,000 that was in the 2015 plan? That's why I say this is a collateral attack on that final order. That order, the confirmation order back in 2015, which implemented the $1,800,000 number, went final. No one appealed. The debtor paid on it. One of the challenges is not just on the numbers, it's who's liable for it, which may be where Mr. Smith started. I don't quite remember the first argument he was making. Some of this is BVS, some of this is the owner, principal, where Palosato is. Why don't you address that? What is the significance of this joint, of this, I don't want to say consolidated, but this order, this joint in 2015, is it shifting the liability in any of the notes that were executed just by one versus the other? So what happened in the case, apparently, as counsel pointed out earlier, there were some notes that were by the Palosatos individually, and then some notes that were by BVS, the debtor. BVS's debt was some $500,000, and Palosato's was $1,002,000 or so. So in the case, as you pointed out, Judge Southwick, it was not a joint, it was not a consolidated case, but it was a case that where the judge had combined both debtors. Mr. Palosato had a case going on, and so did BVS, and the court entered a joint plan. And that plan said that shall, BVS shall pay those monies. Now here's the thing of it. You ask why that may have happened. You're probably addressing what I'm interested in, and you can tell me it's the wrong thing to be interested in. Once this bankruptcy plan is no longer being followed, once the payments are no longer being consistently made, if in fact there needs to be a reordering, a new bankruptcy, whatever else, what happened in 2015, in your view, that would make BVS liable for any of the notes signed by Palosato or the reverse? Why does Judge King's either order or the plan itself cause that shifting of the obligation? I'll tell you why. I'll tell you why it was done. Tell me why. Deal with this. Deal was, and if you read the plan, it says it in that 2015 plan, it says, if BVS makes these payments, it gets full ownership of the collateral. It's basically buying the asset. Now what says that? The plan. The plan says that. That was the deal. That was sort of the deal that they made at bankruptcy court. And this happens all the time. A company, a debtor, over whom the court has jurisdiction, enters an agreement to buy an asset. That's what this was. If BVS pays, it gets ownership of the property. And so that's the reason for it. I agree with you, it might not make sense otherwise. Why would they do that? That's the reason. All right. Get back on course. OK. So the point here, as I said, is that Prosperity calculated its claim in the second bankruptcy simply by taking the agreed claim amount from the 2015 plan, reducing the payments, and then coming out with a number of 1.3. So at the bankruptcy court hearing, Mr. Palosoto said several things. And I hear counsel here today say they're only complaining about application of the adequate protection payments, and that's all well and good. We can talk about that. But at hearing, Mr. Palosoto testified that he thought there was no debt owing at all. He thought that he had paid off everything. And that both the $1.8 million number in 2015 and the $1.3 million number in 2019 were simply wrong. I don't want to burden the court with some testimony from the hearing, but I think I'd like for you to hear his words, Mr. Palosoto's words. Question, but did you not, in fact, object to the plan, to that claim, any time, did you? Answer, I didn't ever have time to sit down and do what I had to do to spend the time to figure this out, of what you all were trying to do. He's telling us he didn't have time to figure out whether the $1.8 million number was right in 2015. Says, OK, but in there it says pretty clearly, prosperity shall have and allow secure claim in the amount of a million and change. So from that date forward, is the number we're working with? Answer, it's not the right number. It's already been, I've already proven that. Question, well, then how come you agreed to it? How come you proposed that number in your own plan if it wasn't correct? Answer, I was counseled into doing it. I could object to it later on, down the line, so long as I was in bankruptcy. Question, but in fact, you did not object during that time. Answer, not until I got enough evidence. And he goes on. So the point here is Mr. Palosoto has given us no concrete evidence from his testimony about what he paid. He just has these bald assertions. Now, he did have some evidence that day he presented as a hearing. And those were evidence of payments that were made beginning in 014 to 019. There was D through I. What can you tell us? I know you're briefing addresses. It's one thing if on the stand the debtor may have said things that aren't fully supported by the record. We'll have to decide that. But regardless of whether there's any evidence to show that the debt's been fully paid, there is evidence of these two groups of payments that were mentioned already. So tell us about 2015 and tell us about 2019. Are they different? How do we know how the plan incorporated those earlier ones? How do we know what the 2019 payments were for and what will happen to the ultimate liability of BBS based on that? Yes, sir. So at Record on Appeal 2008 and 2009, there's one ledger. And at 010, 2010, and 2011, there's a second ledger. If you look on those ledgers, I have them right here. If you look on those ledgers, they show the starting number for the calculation of the proof of claim, $1,812,000. And it goes down and shows 39 payments of $19,224. So that's the ledger through the following of your proof of claim? That's the plan payments following the 2015 adequate protection payments. I'll come to that. I'll come to that in a second. Yes, sir.  You have the ending number on the next page, $1,333,000. That's the proof of claim in the second case, all right? And then following that are seven payments of $19,000. So there in that chart, we see that's the 2019 adequate protection payments. We see that in the ledger. And we see 39 plan payments. Now look on 2010. It's the next ledger over. There you see, at the beginning of the page, a number of $57,674 and four payments of $19,000. That's where, right there, those are those 2014, 2015 adequate protection payments. That's where they're being applied to interest. So this chart shows. Applied to interest? Yes, sir. Those numbers, they are largely applied to interest. You can see right there in the next column, it says interest applied. And it shows that they're being applied to interest. Now, to Judge Clement's question earlier, no. The bankruptcy court order, nor plan, nor motion for adequate protection said this should be applied to interest or principal. It didn't say that. Now, we all know the secured creditor can get paid for his post-petition interest under 506C. So there's no prohibition against applying this to interest. There's nothing wrong with that. Plan only required that they get credit for it. And they got credit for it. And this ledger shows that. Are you talking about the 2015 payments now? Yes. How about 2019? The 2019 payments, oh, and by the way, let me correct something that counsel mentioned earlier. We will obviously apply those to the debt. So counsel was, I think, as I understood him to say earlier, that someone had said to him, or said at the hearing, that the 2019 adequate protections would not be applied to debt. That's just incorrect. There are obviously payments that will be applied. Well, your 2019 proof of claim covered the debt as of that date. And these other 2019 payments were after that date? Yes, sir. And as you pointed out earlier, we're here about what was owed on the petition date. OK. OK. So a couple of matters, a couple of points that counsel mentioned involve subject matter jurisdiction. And in their pleadings, they cast a wide net that a number of things were on the bankruptcy court's subject matter jurisdiction. So I think we're clear that they're saying that it's the 2015 court that did not have subject matter jurisdiction. They're saying that it did not have jurisdiction to shift the debt, as he talked about, and didn't have jurisdiction about the amount of the claim and so on, some other things. But just let's be clear, it's the 2015 plan. My point is this. It's true, yes, that you can bring up subject matter jurisdiction at any time, and they make that point several times in their brief. But that's not exactly the whole story. The whole story is, as Judge Jolly wrote in the Shoeff case, and he was following the Stoll case, the Supreme Court case from 1938, they all make the point that once a judgment goes final, no appeal having been taken, you cannot collaboratively attack that judgment. That's what happened here. The 2015 case went final. You can no longer say that that court did not have subject matter jurisdiction. In the Stoll case, the quote was, quote, every court in rendering a judgment tacitly, if not expressly, determines its jurisdiction of the parties and the subject matter, close quote. And this is true, by the way. Even if subject matter is not even raised at the time. By the entry of that order, the court is saying I have subject matter, and that's once and for all. So subject matter jurisdiction of this 2015 court is way late. It's too late. I cite to a case called Arrowhead, Camp Arrowhead, that former bankruptcy judge Lathe Clark wrote some years back. And they say that to this point, that they can still raise subject matter jurisdiction. And he did say that. But the rest of the sentence that was left out was, at least for so long as the matter before the court is not yet final. Thanks to Coldwater's Rule 59 motion, the question of subject matter jurisdiction is still very much alive. So, race judicata, and the issue of whether it's the same cause of action, I think it's pretty clear it's the same cause of action. They say that, no, it's not the same cause of action, because now there's a new claim amount, there's a new payment schedule, there's a new plan. They say the previous plan ceases to exist, and so on. But by the way, they don't cite any cases in support, mind you. But to put a finer point on it, I think, since I've shown where the adequate protection payments in both 2014 and 2019 are reflected in the bank's ledgers, and I've shown the plan payments then, the only thing they're complaining about occurred prior to the 2014 bankruptcy. That's all they could be complaining about. If we've shown that all the other payments are applied correctly, properly, race judicata, in effect, could only apply to those cases, to those payments prior to them. So that's what we're saying. The cases of veto asset, how and banks are instructed, we think, those three cases stand for the propositions that if BDS's complaint in the second action puts into issue the same facts which were at issue in the first case, the second action is barred. That's what we have here. There's also some case law that says, even if there is an identity in claims, race judicata does not bar the second action unless the plaintiff could or should have brought it in the former action. And as I mentioned earlier, Mr. Pellicotto said, I didn't have time to sit down and do what I had to do to spend the time to figure this out. So he knew there was an issue, if there was. He should have brought it up then. That's the whole point of this. Very briefly about judicial estoppel, I think Appellant is a little misguided in this briefing. And it's true that Judge King did base his ruling on judicial estoppel, as well as some other things. But he threw in the case of NRA Coastal Plains. And a lot of the briefing has then been done on NRA Coastal Plains, as well as some other cases like Reed versus City of Arlington and Tyson v. Love. And so those cases really deal, they do deal with race judicata, but they're really more in the nature of a duty to disclose. What happens in these cases a lot of times is you have a debtor who has a claim or cause of action against someone or some party, and they don't schedule it. It's just not listed, even though it would be an asset of the estate. So then the case is finished. Later, the debtor goes out and sues on the claim. The other party, the defendant says race judicata. You said in your schedules that this case did not exist. You had a duty to disclose it. So that's what these cases, these three cases that I mentioned, they deal with that. It doesn't fit into these facts really. This is not an issue of non-disclosure. So by saying VVS didn't disclose, so Judge King may have oversighted judicial estoppel by reference to NRA Coastal Plains. This is just a simple case of, is it plainly inconsistent with what they said before? Is what they're saying now, that the claim is not 1.8, is it inconsistent with them saying in 2015, the number is 1.8? So in conclusion, my beginning here today was that this was a collateral attack on a plan that went final five years ago. I've cautioned you that an attack such as this endangers the finality of the orders that we see in bankruptcy cases. And this is not a case of an attack, of an order that was entered against the debtor. This is not somebody sued the debtor, got a judgment against him, and he doesn't like it. This is of their own making. This is their plan. They filed the plan. Palosotos signed it individually, and in its capacity as the debtor. And not only that, they paid on it 38 months, only to now claim it's the wrong number. And so that's why this should be an easy case. And remember, it is of their own doing, because Mr. Palosotos, again, said, quote, I didn't have the time to sit down and figure this out back in 2015. All right, counsel. Thank you. Thank you. May it please the court. My name's Susan Clothier, co-counsel for BVS Construction. I would just like to address two things that my opposing counsel had said during his argument that I believe are incorrect. The first thing is related to the motion for, I'm sorry, for the subject matter jurisdiction. The 2019 court is the court in which we were alleging did not have jurisdiction. Not back when the 2014-2015 bankruptcy. We're saying that the debt did not transfer. The effect of the 2014 confirmation plan did not transfer the debt from the Palosotos individually to BVS. Therefore, the court, when they were deciding the objection to the proof of claim, did not have the jurisdiction over those three notes. What was the remaining value of the debt at that time? I'm sorry. What was the question? When the time you're talking about when the transfer occurred, what was the value, the remaining value of the debt that was owed to the bank? At the time of the petition in 2019? Yes. That is what's up for dispute, actually, in the case. So we don't believe that the record reflects all of that information. We do believe the record does reflect, for sure, the four payments that were made in 2015. We are not relitigating the 2014 plan. I just want to make sure that's very clear. The language of that plan. What's your answer? What's the value? I don't have a number specifically, but it's definitely, I'm not a math person. I mean, we would have to remove the four payments that were not credited and then determine the amount of interest that was paid in those four years, and then the amount then that was filed in 2019 would be reflected on that equation of whatever that would be. We estimated approximately $100,000 to $25,000 less than what they submitted based on that simple, that one, those four payments from 2015. Does that answer your question better? That's your answer. So the actual 2015-2014 plan specifically states that it gives, as of the petition date, the total indebtedness was $1.8 million. Then it further states that the debtor shall receive credit on the prosperity claim for all amounts paid post-petition pre-confirmation on the prosperity claim. Those four payments were made post-petition pre-confirmation, did not reflect on the ledger. Under 11 U.S.C. 1141A, both the creditor and the debtor have the duty to follow the plan. We're not stating that the 2014 plan is needing to be relitigated. We're stating that prosperity did not follow its duty under the plan by crediting those four payments, which would then, in effect, have reduced the amount of indebtedness that would have been in the 2019 bankruptcy. And back to the subject matter of jurisdiction, the 2014 plan did not transfer the debt. It does have a clause that says, upon payments of the Clause 16 claim, all prosperity collaterals shall belong to the debtor BVS. When you look at 11 U.S.C. Section 1123A-5, it does state that you can, in a bankruptcy confirmation plan, transfer ownership of property. It stops there. It doesn't say transferring ownership of property, then also transfers the debt. And it also specifically states that upon payments of the claim that never happened. So that was a precondition for transferring the property. So the transfer of the property also never happened. Therefore, the transfer of the debt did not happen either. And then also, I just want to reiterate that we are not subject matter of jurisdiction back of the bankruptcy that occurred in 2014. We're challenging the subject matter of jurisdiction of the court, Judge King, in 2019 that awarded all of the promissory notes as if BVS were the one that was responsible for paying all of that debt when that was no effective transfer. So that's all I have unless there's any questions. All right, Counselor. Thank you. Thanks to all three of you for helping us understand the issues in this case. That concludes the arguments for today. We are in recess.